UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

VIVIAN JACKSON, Personal
Representative of the Estate of Darius
Johnell James,

                Plaintiff,

-vs-                             Case No.  5:10-cv-568-Oc-10PRL

EDWARD DEAN, Sheriff of Marion County
Florida, in his representative capacity, et
al.,

                Defendants.
_____/

## ON REMAND FROM THE COURT OF APPEALS
## ORDER DENYING SUMMARY JUDGMENT

On October 14, 2007, Darius Johnell James, a 22-year old pretrial detainee at the

Marion County Jail in Ocala, Florida, committed suicide by hanging himself with a bed

sheet in his cell.  James' mother and personal representative of his estate, Vivian Jackson,

filed suit pursuant to 42 U.S.C. § 1983 against the Sheriff of Marion County, Florida, in his

official capacity, and 10 corrections officers in their individual capacities.  Ms. Jackson

contends that these Defendants violated James' constitutional rights by being deliberately

indifferent to the known and serious risk that James would commit suicide (Doc. 1).[1]

---

[1]Because James was a pretrial detainee who had not been convicted of the crime with which he was charged, the Eighth Amendment's prohibitions against cruel and unusual punishment do not apply.  See Tittle v. Jefferson Cnty. Comm'n, 10 F.3d 1535, 1546 (11th Cir. 1994) (en banc).  Instead, James' claims of deliberate indifference are properly analyzed under the Substantive Due Process Clause of the Fourteenth Amendment.  See Snow v. City of
(continued...)

The Defendants each moved for summary judgment (Docs. 34-36).  The Sheriff argued that no official custom, policy, or practice existed which caused James' suicide, and therefore he was not liable.  The 10 individual officers each contended that they were immune from suit under the doctrine of qualified immunity.  On March 26, 2012, the Court denied the motions for summary judgment as to the Sheriff, and as to Defendants West, Burnette, Ross, McEwan, Forte, Lavertue, and Thorsberg due to the existence of disputed issues of material fact (Doc. 76).[2]  The Defendants who were denied summary judgment in their favor moved for clarification (Doc. 78), which the Court denied on March 28, 2012 (Doc. 79).

Defendants Burnette, Forte, Lavertue, McEwan, Ross, Thorsberg, and West (the "Individual Defendants") filed a notice of interlocutory appeal seeking review of the Court's denial of their motions for summary judgment asserting the defense of qualified immunity (Doc. 81).  See Leslie v. Hancock County Bd. of Educ.,720 F.3d 1338 (11th Cir. 2013).  The Individual Defendants also moved to stay all proceedings in this Court pending resolution of the interlocutory appeal (Doc. 82).  The Court granted the stay on March 30,

---

[1](...continued)

Citronelle, Ala., 420 F.3d 1262, 1268 (11th Cir. 2005); Cagle v. Sutherland, 334 F.3d 980, 985 (11th Cir. 2003).  The deliberate indifference legal analysis applied to pretrial detainees under the Fourteenth Amendment is identical to the analysis applied to convicted inmates under the Eighth Amendment.  Marsh v. Butler Cnty., Ala., 268 F.3d 1014, 1024 n. 5 (11th Cir. 2001) (en banc). See also Goodman v. Kimbrough, 718F.3d 1325, 1331 n. 1 (11th Cir. 2013); Bozeman v. Orum, 422 F.3d 1265, 1271 (11th Cir. 2005).

[2]The Court granted summary judgment in favor of Defendants Mosher, Savarese, and Hampton, and directed the Clerk to enter judgment as to those Defendants immediately (Doc. 76).

2012, and administratively closed the file subject to the right of any party to seek leave to reopen the case upon the issuance of a mandate from the Court of Appeals (Doc. 84).

On May 8, 2013, the Court of Appeals issued its mandate (Doc. 90).  The court vacated this Court's order denying the Individual Defendants' motions for summary judgment and issued a limited remand to this Court "to enter a reasoned order that addresses whether these seven officers are entitled to a summary judgment based on review of the relevant facts and applicable law." (Id., p. 5).

## Relevant Material Facts

The facts, in the light most favorable to Ms. Jackson, are as follows.  See Goebert v. Lee County, 510 F.3d 1312, 1316 (11th Cir. 2007).

## I.     The Parties

The Plaintiff, Vivian Jackson, is the mother of the decedent, Darius Johnell James, and is the Personal Representative of his Estate.  On June 28, 2007, Ms. Jackson called 911 to report that James was missing and endangered.  James had been engaging in bizarre and unsafe behavior, and Ms. Jackson was concerned for his safety.  Two days later, on June 30, 2007, James was arrested for home invasion and vehicle theft.  He was taken to the Marion County Jail for detention as a pretrial detainee.  He remained at the Jail for three and a half months until his death on October 14, 2007.

The Individual Defendants are corrections officers with the Marion County Sheriff's Office.[3]  During the time of James' confinement and suicide, they were each working at the Marion County Jail.  At various times during James' confinement, all of the Individual Defendants were assigned to the section of the Jail in which James spent the majority of his detention (the Charlie Foxtrot Section); and, in particular they were assigned to that section for several days during the period leading up to James' suicide.

## II.   James' Incarceration at the Marion County Jail

At the time of his admission to the Jail on June 30, 2007, James was given a Suicide Prevention Screening by a Licensed Practical Nurse employed by Prison Health Services ("PHS").[4]  The nurse noted that James made a "statement that he was ready to die" and that he was suffering from possible schizophrenia or bipolar disorder.  (Doc. 19, Ex. L, pp. 1-7).  James was then assigned to the Jail's suicide prevention section, located in the medical pod.  (Id.).

On the morning of July 1, 2007, a PHS Mental Health Counselor conducted a psychological examination of James.  Although James denied any suicidal ideation, he was defensive and agitated, and stated that everyone wanted to kill him.  (Doc. 19, Ex. L, pp. 9-10).  The counselor directed that James be designated as a "special needs" inmate and

---

[3]Defendant Lavertue is no longer employed by the Sheriff's Office.

[4]In 2007, the Sheriff's Office had a contract with Prison Health Services ("PHS"), an independent contractor, to provide licensed medical and mental health professionals to meet the medical and mental health needs of inmates.  This included evaluating inmates and pretrial detainees for potential suicide risks.

removed from the suicide prevention section.  (Id., pp. 13-15).  That did not necessarily mean, however, that James had been determined not to be a risk of suicide.  According to Marion County Sheriff's Office Operations Directive 6766.05, special needs inmates include, among other ill or disturbed individuals, "those who present a high risk to themselves and/or others, and inmates who require protective custody."  (Doc. 19, Ex. C).

Special needs inmates, like James, are not housed in the medical pod which is reserved for inmates who are on suicide watch or who have medical problems that require close supervision (Doc. 19, Ex. D).  Rather, special needs inmates are housed in Charlie Pod, section F (the "Charlie Foxtrot Section"), where inmate monitoring is less intense. Although the Individual Defendants contend that inmates on suicide precaution are never housed in the Charlie Foxtrot Section, Ms. Jackson has presented evidence in the form of a Post Order which states that suicide prevention inmates were authorized to be housed in cells in the lower level of the Charlie Foxtrot Section in October 2007 (Doc. 41-7, p. 2; Doc. 42-6, p. 10).  This was consistent with PHS' Policy and Procedures Manual which provided that inmates of the Marion County Jail "who are placed on Suicide Precaution will be housed in B-Pod and C-Pod (special housing area), and/or the Infirmary."  (Doc. 41-5) (emphasis supplied).

Thus, on July 1, 2007, although James was removed from the suicide prevention section of the medical pod, he was transferred to the Charlie Foxtrot Section, cell 247, located on the upper level, and at some point that same day, for reasons that are unclear from the record, Defendant Thorsberg moved James to cell 154, on the lower level of the

5

Section.  Viewing the evidence in the light most favorable to Ms. Jackson, a reasonable jury could infer from these events that James was still being regarded as a suicide risk or, at least, someone who presented a high risk to himself per Operations Directive 6766.05.

At approximately 9 p.m. on July 1, 2007, Thorsberg was involved in an interaction with a disruptive inmate, James Evans, who was also housed in the Charlie Foxtrot Section.  During the interaction, James made comments suggesting that he wanted to beat up Thorsberg, and made gestures including pounding his fist in his palm.  James did not otherwise get involved in the interaction between Thorsberg and Evans.  Thorsberg eventually restrained Evans and transferred him to another section of the jail.  Thornsburg, along with Defendant Lavertue and another corrections officer, then counseled James not to engage in any further aggressive behavior.  At the conclusion of this counseling session, Lavertue and another corrections officer escorted James to Alpha Pod for confinement until James could receive a psychological examination.[5]

Thorsberg prepared an Incident Report detailing these events, at the conclusion of which he stated "it was obvious to all officers that inmate James has certain anti-social, aggressive behavioral problems that may need to be addressed by the medical/psych department."  (Doc. 19, Ex. G, p. 1).  Thorsberg also noted that James exhibited "diminished mental capacity."  (Id.).  A PHS Mental Health Counselor met with James the

---

[5]Alpha Pod is reserved for inmates who require disciplinary confinement, who require isolation and/or have been placed in administrative confinement, or have been placed in protective custody (Doc. 19-4).

6

following day, July 2, 2007.  James told the counselor that he was "god's chosen one," and that he never had any mental health problems until he took cold medicine.  (Doc. 19, Ex. L, p. 16).  Neither the Incident Report or the PHS Medical Records make any mention that James exhibited any suicidal tendencies at that time.

James remained housed in Alpha Pod for three days.  On July 4, 2007, he became extremely agitated and violent and began to yell, kick his cell door, and throw water out of his cell.  Defendant Burnette, along with four other corrections officers entered James' cell in an attempt to subdue him.  One of the officers deployed taser probes into James three times until James became compliant.  The officers then restrained James in a hospital bed for several hours.  (Doc. 44-5, p. 2).  While he was restrained, James met with a PHS psychiatrist, who noted that James appeared to be disoriented and agitated (Doc. 19, Ex. L. P. 16).  James was ultimately released from his restraints later that night and returned to his cell without incident.

On July 5, 2007, James became aggressive toward a corrections officer(s), and another psychiatric examination was requested.  A PHS psychiatrist evaluated James that same day.  The psychiatrist found that James had a serious mental illness and was probably schizophrenic; however, the psychiatrist did not order James to be moved to the medical pod or to the Charlie Foxtrot Section.  (Id.).

At approximately 10 p.m. the next day, July 6, 2007, corrections officer Kenneth Mosher was making a security check in Alpha Pod.  James stated to Mosher that he wanted to commit suicide.  When Mosher inquired further, James stated "for real, I'm super

7

suicidal.  I want to cut my throat." (Doc. 19, Ex. H).  Mosher then handcuffed James, and escorted him to the medical pod, where he was seen for evaluation by a PHS psychiatrist. James was subsequently placed in the suicide prevention section of the medical pod (Id.; see also Ex. L., p. 19).  Mosher notified his supervisor, Sergeant Savarese, of the incident. Significantly, Mosher also prepared an Incident Report noting James' placement on suicide watch, and that report was forwarded to Defendant Forte, the Watch Commander that day, for review. (Id., Ex. H).

On July 10, 2007, James was transferred from the medical pod back to the Charlie Foxtrot Section, cell 250, upper level.  (Doc. 19, Ex. L, pp. 27-30).  On July 11, 2007, he was moved to cell 254, upper level, in that same Section.  On July 16, 2007, James was again seen by a PHS psychiatrist.  On July 17, 2007, James was moved to the Alpha Pod again and placed on administrative confinement.  James was returned to the Charlie Foxtrot Section on July 24, 2007, cell 248, upper level.

On August 3rd, 5th, 7th, 9th, and 31st, James submitted inmate medical request forms stating that he was having trouble sleeping and was extremely stressed.  PHS had placed James on a psychotropic drug, proloxin, and James was concerned that the medication was preventing him from sleeping.  It appears that James' requests for assistance were largely ignored; the notes from his medical file state that James could bring up his sleeping concerns at a later scheduled follow up appointment with the PHS psychiatrist.  (Doc. 19, Ex. L, pp. 48-51, 56).

8

On August 6, 2007, Defendant Lavertue and another officer were alerted to a fight in Charlie Foxtrot Section, cell 248.  When the officers arrived, inmate Anthony McBride was on top of James hitting him with closed fists.  James and McBride continued to fight, despite warnings from the two officers to stop.  Eventually Defendant Lavertue and the other officer were able to separate James and McBride by using pepper foam and a stun device on inmate McBride.  A small amount of the pepper foam landed on James' face, and he was seen by a nurse.  (Doc. 19, Ex. J).  James was cleared to stay in Charlie Foxtrot Section, but on August 7, 2007, Defendant Lavertue moved James to cell 154, on the lower level.

On August 14, 2007, James was moved out of the special needs Charlie Foxtrot Section to the general population Charlie Bravo Section.  That unit houses male inmates charged with serious violent crimes.  It appears that this change was made because James requested to be moved into the general inmate population. (Doc. 19, Ex. L, p. 53).  However, James then requested to be returned to the special needs section the very next day; and he was moved to the Charlie Foxtrot Section on August 15, 2007 (Id., pp. 54-55).  Defendant Lavertue placed James in cell 152 on the lower level, the second time he had done so.[6]

---

[6]The record does not specify why Lavertue housed James in a lower level cell on either August 7, 2007 or August 15, 2007.  Here again, however, viewing the evidence in the light most favorable to the Plaintiff, a reasonable jury could infer an awareness on the part of Defendant Lavertue that James was either suicidal or, at least, somone at risk to harm himself.

On September 4, 2007, James was involved in an altercation with an inmate while he was housed in the Charlie Foxtrot Section.  James was not the aggressor; another inmate hit James on the head with a dinner tray.  He was checked for injuries, and then returned to Charlie Foxtrot Section.  (Doc. 44-6, pp. 4-5).

On September 21, 2007, James became embroiled in yet another dispute with an inmate.  This time, the corrections officers were able to get into Charlie Foxtrot Section in time to prevent the dispute from turning into a physical altercation.  James was issued a disciplinary report, but remained in Charlie Foxtrot Section until September 23, 2007, when he was placed in the Alpha pod for disciplinary confinement.[7]  (Docs. 44-7, pp. 2-3).  He remained in Alpha pod until October 2, 2007, when he was transferred back to Charlie Foxtrot Section, cell 254, upper level, where he was housed until his death.

## III.   James' Suicide

On October 14, 2007 James committed suicide by hanging himself in his cell with a bed sheet tied to a post on his bunk bed.  He was found by another inmate at approximately 10:09 a.m.  At the time of his suicide, James was housed in cell 254 located on the upper level of the Charlie Foxtrot Section.  James was not under any suicide watch or mental health watch precautions at the time of his death.  He was visually observed only twice daily as part of the regular inmate headcount.  On the day of James' death,

---

[7]The officers involved in the September 4 and September 21 altercations are not defendants in this case.

Defendant West was the last officer to see James alive at 7:20 a.m. (Doc. 29, pp. 7-8; Doc. 44-4, p. 3).

Cell 254 in particular was the furthest cell from both the officers' watch station and the control tower.  There were no cameras or other viewing devices that enabled officers to view the bunk beds in cell 254.  The only way an officer could check on an inmate located in cell 254 would be to physically walk to and stand in front of the cell door.

On the day of James' death, Defendants Burnette, McEwan, Ross, and West were located in the rovers office in Charlie Foxtrot Section when an inmate worker notified them that another inmate had hanged himself.  Ross was the supervisor, and Burnette was the Watch Commander.  All four of these Defendants testified at their depositions that they immediately ran to cell 254.  At this point their testimony differs slightly.  West testified that he ran up the stairs and into cell 254, and found James hanging off the post of his bed.  West further testified that he and McEwan grabbed James and picked him up while Burnette removed the noose and laid James on the ground.  (Doc. 29, p. 5).  West also stated that he was the officer who removed the noose, and that they all started CPR immediately.  (Id., pp. 5-6).  However, Ross testified that all four officers removed James from the bedpost, that Ross lifted James' body in an effort to alleviate the pressure on his neck, and Burnette removed the noose.  (Doc. 30, pp. 14-15).  See also Doc. 19, Ex. I and Ex. L, pp. 58-59.

This somewhat conflicting testimony is further muddied by the declaration of Tyrone Summers, an inmate who was housed in cell 247 in the Charlie Foxtrot Section on the day

11

of James' death.  (Docs. 43-3, 43-4).  Summers declared that he ran into cell 254 and

untied James, and then waited over 10 minutes for any officers to arrive, despite the fact

that another inmate was continuously banging on the door to get the officers' attention.

(Doc. 43-3).  Summers further declared that only one officer arrived at the cell initially, and

that the responding officer then left for help.  According to Summers, it was another few

minutes before any other officers arrived.  When four officers finally arrived, Summers was

holding James in his arms.  Summers was then forcibly removed from cell 248.  (Id.).[8]

## IV.   The Critical Issue of Fact

Each of the Individual Defendants state that they had no direct knowledge that

James intended to commit suicide on October 14, 2007.  They contend that they never

witnessed James making any threats of suicide or exhibiting any suicidal tendencies in the

weeks immediately preceding his death, and that no inmates ever reported that James was

making threats of suicide.  This coincides with the Supplemental Incident Report prepared

as part of the Sheriff's Office's investigation into James' death, which states that several

other inmates were aware that James had been making threats of suicide for several

weeks, but according to the report, the inmates did inform any corrections officers about

James' threats.  (Doc. 44-9, pp. 4-5).

---

[8]Summers declaration is contradicted by the Marion County Sheriff's Office's Incident
Report, which lists an inmate by the name of Ronald Seiler as the person who found James' body
(Doc. 43-5, p. 7).  Summers' declaration is further contradicted by the statements he gave as part
of a Florida Department of Law Enforcement ("FDLE") investigation into James' death.  Summers
told the FDLE investigator that he did not enter James' cell, and did not touch James' body.  (Doc.
55-5).

On the other hand, the Plaintiff has submitted the declaration of Jean-Pierre Francis, an inmate housed in the Charlie Foxtrot Section in October 2007.  Francis states that he was "aware that James had been telling the officers for 2-3 weeks prior to his death that he was going to hurt himself."  (Doc. 43-2).  Francis further states that he had "personal knowledge that the officers in that section of the jail were aware of threats Darius [James] had made to kill himself but they just didn't care."  (Id.).[9]  There is no dispute that the Individual Defendants were assigned to patrol and/or supervise the Charlie Foxtrot Section at various points in time during the weeks before James' suicide, and Ms. Jackson has submitted the Jail's post assignment records which show that each of the Individual Defendants were assigned to the Charlie Foxtrot Section at times between September 28, 2007 and October 13, 2007 (Docs. 43-5 through 43-11).  Moreover, as previously noted, Ms. Jackson has also submitted evidence showing that suicidal inmates were authorized to be detained in the lower level of the Charlie Foxtrot Section, and that the Individual Defendants relocated James to the lower level on multiple occasions without explanation.

In addition to this factual evidence, both direct and circumstantial, the Parites have submitted competing expert reports addressing, among other things, whether the Individual

---

[9]The Individual Defendants contend that Francis' declaration is contradicted by statements he made in an interview with the FDLE during the course of its investigation into James' death. (Docs. 55-2, 55-3).  The statements made by Francis during this interview do not contradict Francis' declaration.  Rather, Francis' prior statements in his interview merely say that James did not have any problems with any of the inmates or corrections officers, other than inmate Ronald Seiler, and that Francis could not speak to James' demeanor on the day of his death because he did not see James.  (Doc. 55-3).  It is worth noting that the investigator never asked Francis whether James had ever made any threats of suicide or exhibited any suicidal tendencies.

Defendants were deliberately indifferent to a known risk that James would commit suicide.[10] The Individual Defendant's expert, David M. Parrish, has opined that James "was not 'suicidal' from the vantage point of the corrections officers," and that the actions of the Individual Defendants "were consistent with standard operating procedure and were reasonable and proper under the circumstances."  (Doc. 20, ¶¶ 3(c), 5).

In contrast, Ms. Jackson has submitted the expert report of Ronald D. McAndrew,[11] who rendered the following opinions:  (1) that James repeatedly advised corrections officers and staff that he was suicidal; (2) that appropriate measures were not taken to protect James from killing himself; (3) that corrections officers did not observe James for almost three hours prior to his death; and (4) that all of the Defendants were deliberately indifferent to James' known risk of suicide.  (Doc. 42-10, p. 6).

## V.    Relevent Jail Policies and Procedures

At all relevant times, the Marion County Sheriff's Office had formal policies in place which governed the classification and supervision of inmates at the Jail, the training to be provided to corrections officers to enable them to recognize the signs and symptoms of suicidal inmates, as well as the level of supervision and care to be provided to suicidal inmates.  See, e.g., Doc. 19, Exs. A, D, E; Doc. 34, Ex. 1; Doc. 41-3; Doc. 41-4; Doc. 41-5,

---

[10]Federal Rule of Evidence 704 provides that "[a]n opinion is not objectionable just because it embraces an ultimate issue."

[11]Mr. McAndrew has 23 years of experience working for the Florida Department of Corrections.  He started as a corrections officer and worked his way up to Warden of several state prisons, including the Florida State prison in Starke, and the Central Florida Reception Center. He also worked as the interim Director of the Orange County Jail.  (Doc. 42-10).

Doc. 41-6).   Marion County Sheriff's Office Operations Directive 6011.00, entitled

"Supervision of Inmates-Jail" states, in pertinent part, that

> All high and medium security inmates are observed by a corrections officer as frequently as possible.   More frequent observation is required for those inmates who are violent, mentally disordered, suicidal, or who demonstrate unusual or bizarre behavior.   Suicidal inmates are under continual observation.

Doc. 41-3, p. 1.

It appears that James was classified as either a medium or high security inmate for

a large portion, if not all, of his incarceration.  See Docs. 44-5 through 44-7.   However,

when asked about this Operations Directive at their respective depositions, Defendants

Burnette, Forte, and Ross admitted that they did not apply this Directive to their supervision

of James.  See  Doc. 42-1, pp. 8-9; Doc. 42-2, pp. 10-11; Doc. 42-6, pp. 5-7.

Ms. Jackson has also presented evidence that between 2000 and 2007 there were

seven inmate suicides at the Marion County Jail, not including James' death.   Of these

seven previous suicides, five were by hanging.   Of these five, four were by hanging from

the bunk in the cell, and three took place in the Charlie pod section of the jail.   Moreover,

of the five suicides by hanging, two took place in the Charlie Foxtrot section, in the same

area near James' cell.

## Standard of Review

Pursuant to Federal Rule of Civil Procedure 56(a), "[t]he court shall grant summary

judgment if the movant shows that there is no genuine dispute as to any material fact and

the movant is entitled to judgment as a matter of law."  In applying this standard, the Court

must examine the materials on file and the record evidence "in the light most favorable to

the nonmoving party."  Samples on Behalf of Samples v. Atlanta, 846 F.2d 1328, 1330

(11th Cir. 1988).  When faced with a "properly supported motion for summary judgment [the

nonmoving party] must come forward with specific factual evidence, presenting more than

mere allegations."  Gargiulo v. G.M. Sales, Inc., 131 F.3d 995, 999 (11th Cir. 1997).  The

party opposing a motion for summary judgment must rely on more than conclusory

statements or allegations unsupported by facts.  Evers v. Gen. Motors Corp., 770 F.2d 984,

986 (11th Cir. 1985) ("conclusory allegations without specific supporting facts have no

probative value").

At the summary judgment stage the judge's function is not to weigh the evidence and

determine the truth of the matter but to determine whether there is a genuine issue for trial.

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S. Ct. 2505, 2511 (1986).  Some

degree of factual dispute is expected, but to successfully counter a motion for summary

judgment the factual dispute must "affect the outcome of the suit" and must be "such that

a reasonable jury could return a verdict for the nonmoving party."  Id. at 248, 106 S. Ct. at

2510.

## Discussion

In Counts II-V, VIII, and X-XI, Ms. Jackson alleges that Defendants West, Burnette,

Ross, McEwan, Forte, Lavertue, and Thorsberg violated James' rights under the

16

Fourteenth Amendment because they were deliberately indifferent to the known risk that James would commit suicide (Doc. 1).  Each of these Defendants asserts entitlement to the defense of qualified immunity.

## I.    The Law Regarding Qualified Immunity

42 U.S.C. § 1983 enables a private citizen to sue any person acting under color of state law who violates his or her federal constitutional rights.  See Collins v. City of Harker Heights, Texas, 503 U.S. 115, 120, 112 S. Ct. 1061, 1066 (1992).  This ever present threat of litigation may stymie a law enforcement or prison official's ability to perform his or her duties effectively.  To address this concern, the doctrine of qualified immunity was created.  This doctrine "offers complete protection for individual public officials performing discretionary functions insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Loftus v. Clark–Moore, 690 F.3d 1200, 1204 (11th Cir. 2012) (quoting Sherrod v. Johnson, 667 F.3d 1359, 1363 (11th Cir. 2012) (internal quotation marks omitted)).  Qualified immunity is an immunity from suit rather than a mere defense to liability, and it is effectively lost if a case is erroneously permitted to go to trial.  Mitchell v. Forsyth, 472 U.S. 511, 526, 105 S. Ct. 2806, 2815 (1985).

"[T]o obtain qualified immunity, an official must first establish that he acted within his discretionary authority."  Morton v. Kirkwood, 707 F.3d 1276, 1280 (11th Cir. 2013).  Because it is undisputed that the Individual Defendants acted within their discretionary

authority, Ms. Jackson bears the burden to "establish that the [Individual Defendants] violated [James'] constitutional rights[ ] and ... that the right involved was 'clearly established' at the time of the putative misconduct." Terrell v. Smith, 668 F.3d 1244, 1250 (11th Cir. 2012).  The Court is "permitted to exercise its sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand."  Pearson v. Callahan, 555 U.S. 223, 236, 129 S. Ct. 808, 818 (2009).

The Court will exercise its discretion and first discuss whether a pretrial detainee's constitutional right to be free from corrections officers' deliberate indifference to a risk of suicide was clearly established at the time of James' death.  If such a right was clearly established, the Court will then address whether the undisputed facts show that the Individual Defendants did not violate James' asserted constitutional rights.

## II.    The Clearly Established Law Regarding Deliberate Indifference to the Risk of Suicide

The Individual Defendants would be entitled to qualified immunity if the law was not clearly established at the time of James' suicide that their actions were unconstitutional. Gonzalez v. Reno, 325 F.3d 1228, 1234 (11th Cir. 2003).  "For qualified immunity to be surrendered, pre-existing law must dictate, that is, truly compel (not just suggest or allow or raise a question about) the conclusion for every like-situated, reasonable government agent that what defendant is doing violates federal law in the circumstances." Jenkins by Hall v. Talladega City Bd. of Educ., 115 F.3d 821, 823 (11th Cir. 1997) (quoting Lassiter

v. Alabama A & M Univ., 28 F.3d 1146, 1150 (11th Cir. 1994) (en banc)).   To prove that

the law was "clearly established," a plaintiff may point to either

> (1) earlier case law from the Supreme Court, [the Eleventh Circuit], or the highest court of the pertinent state that is materially similar to the current case and therefore provided clear notice of the violation or (2) general rules of law from a federal constitutional or statutory provision or earlier case law that applied with 'obvious clarity' to the circumstances, establishing clearly the unlawfulness of the Defendants' conduct.

Long v. Slaton, 508 F.3d 576, 584 (11th Cir. 2007) (citing Marsh v. Butler Cnty., 268 F.3d

1014, 1031-33 (11th Cir. 2001) (en banc)).   "Exact factual identity with a previously decided

case is not required, but the unlawfulness of the conduct must be apparent from pre-

existing law."  Coffin v. Brandau, 642 F.3d 999, 1013 (11th Cir. 2011).

None of the Individual Defendants raise much of an argument as to this prong of the

qualified immunity analysis, which is understandable.   The law has long been clearly

established, through numerous Eleventh Circuit decisions rendered well before the date

of James' death, that a corrections officer who disregards a pretrial detainee's known risk

of suicide violates that detainee's constitutional rights.

As early as 1989, the Eleventh Circuit held that "[i]n a prisoner suicide case, to

prevail under section 1983 for violation of substantive rights, under either the eighth or

fourteenth amendment, the plaintiff must show that the jail official displayed 'deliberate

indifference' to the prisoner's taking of his own life."  Edwards v. Gilbert, 867 F.2d 1271,

1274-75 (11th Cir. 1989) (citations omitted).  And in 1994, the Eleventh Circuit made clear

that pretrial detainees such as James have a Fourteenth Amendment due process right "to

receive medical treatment for illness and injuries, which encompasses a right to psychiatric and mental health care, and a right to be protected from self-inflicted injuries, including suicide." Belcher v. City of Foley, 30 F.3d 1390, 1396 (11th Cir. 1994).  Both of these doctrines have been reiterated on multiple occasions in prisoner and pretrial detainee suicide cases.  See, e.g., Cottone v. Jenne, 326 F.3d 1352, 1358 (11th Cir. 2003); Cagle v. Sutherland, 334 F.3d 980, 985 (11th Cir. 2003); Cook ex rel. Estate of Tessier v. Sheriff of Monroe County, Fla., 402 F.3d 1092, 1115 (11th Cir. 2005); Snow v. City of Cintronelle, Ala., 420 F.3d 1262, 1268-69 (11th Cir. 2005).

The Eleventh Circuit has also long defined the phrase "deliberate indifference" in the context of an inmate or prisoner detainee suicide.  In 1990, the Court of Appeals noted that the standard of deliberate indifference in a jail suicide case "requires a strong likelihood rather than a mere possibility that the self-infliction of harm will occur, and will not be found to exist in the face of negligence only." Popham v. City of Talldega, 908 F.2d 1561, 1563 (11th Cir. 1990) (citations omitted).  And in a 1999 prisoner suicide case, the Eleventh Circuit explained that in order to establish a defendant's deliberate indifference, the plaintiff has to show that the defendant had "(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than mere negligence." McElligott v. Foley, 182 F.3d 1248, 1255 (11th Cir. 1999).  Again, these doctrines have been applied in numerous, more recent decisions, all of which involved an inmate or detainee's suicide while in prison.  See Cagle, 334 F.3d at 986; Purcell ex rel. Estate of Morgan v. Toombs

Cnty., 400 F.3d 1313, 1319-20 (11th Cir. 2005); <u>Cook</u>, 402 F.3d at 1115, <u>Snow</u>, 420 F.3d at 1268.

All of these decisions, which involved prison inmates and pretrial detainees who committed suicide while incarcerated and/or detained, constitute the binding precedent of this Circuit, and were in existence well before James' October 14, 2007 suicide.  The law was therefore clearly established at the time of James' death that deliberately ignoring a known and significant risk that a pretrial detainee was suicidal would violate the Fourteenth Amendment.  <u>See also</u> <u>Heggs v. Grant</u>, 73 F.3d 317, 320 (11th Cir. 1996) ("The law is clearly established that jail officials may not act with deliberate indifference to the risk of inmate suicide.") (citations omitted).

Lastly, with respect to the dispute concerning the level and speed with which James received treatment at the time of his suicide, the law was also clearly established as of October 2007 that delaying medical treatment for an imminent life-threatening condition was unconstitutional.  <u>Bozeman v. Orum</u>, 422 F.3d 1265, 1273 (11th Cir. 2005) (Fourteen minute delay in calling for medical assistance, performing CPR, or providing any other care to a pretrial detainee who was unconscious and not breathing constitutes deliberate indifference).

In sum, the Eleventh Circuits' binding precedent, which is materially similar to the present case, provided clear notice to the Individual Defendants that if they deliberately ignored a significant risk that James would commit suicide, and/or delayed treatment at the

21

time James committed suicide, their actions would violate James' Fourteenth Amendment

rights.

### III.   Material Issues of Fact Remain in Dispute Regarding the Respective Defendant's Deliberate Indifference

Even though the Court concludes that the law was clearly established at the time of

James' suicide, the Individual Defendants would still be entitled to qualified immunity if the

Court finds that the undisputed material facts demonstrate that the Individual Defendants

did not violate James' constitutional rights.  Based on the record before the Court, it is clear

that the resolution of this question hinges on the key issue of whether the Individual

Defendants had the requisite subjective awareness of a suicide risk and deliberately

ignored it.  Whether the Individual Defendants possessed such subjective knowledge is a

question of fact which may be inferred from circumstantial evidence.  Farmer v. Brennan,

511 U.S. 825, 842, 114 S. Ct. 1970, 1981 (1994).  The Individual Defendants rely heavily

upon their own assertions and deposition testimony that they had no subjective knowledge

of any risk that James would commit suicide.  However, Ms. Jackson has presented both

direct and circumstantial evidence (as well as expert opinion) sufficient to create genuine

issues of material fact in refutation of the Individual Defendants' contentions, and to support

a finding of subjective awareness of a strong likelihood of suicide.

Defendants Forte and Burnette held the rank of Captain and were watch

commanders in the Charlie Foxtrot section; Defendant Ross was a sergeant and Defendant

West was a corporal, both of whom had supervisory authority in the Charlie Foxtrot unit;

and Defendants Lavertue, McEwan and Thorsberg were corrections officers in that section. As previously noted, James was twice designated by medical staff as a suicide risk, first at the time of his initial screening on June 30, and again on July 6, a report of which was specifically routed to Defendant Forte.  After that, the Defendants moved James in and out of the Charlie Foxtrot section on several occasions, and from the upper level to the lower level of that unit at other times; and, while it is disputed, there is evidence that one of the places in the jail designated for the housing of suicidal inmates is the lower level of Charlie Foxtrot (Doc. 41-7, p. 2; Doc. 42-6, p. 10).   None of the Individual Defendants have proffered an explanation for the frequent relocations within the Charlie Foxtrot unit.

It is also undisputed that James was classified as a high risk inmate, but was not monitored as frequently as required by Marion County Operations Directives.  (Doc. 41-3). Instead, for the last few weeks of his life, James was detained in a cell that was so remote, that officers could only observe him by physically walking in front of the cell door.  He was not observed for nearly three hours before his death, and no precautions were taken such as removing bed sheets from the cell even though there had been several suicides committed by hanging using a bedsheet in that same section of the Jail.

There is, therefore abundant circumstantial evidence from which a jury might choose to discredit the testimony of the Defendants that they, individually, had no knowledge that James posed a threat of suicide.  There is also the explicit declaration of Jean-Pierre Francis to the contrary, which is corroborated by that same circumstantial evidence. Francis' declaration supports the Plaintiff's position that James made direct threats of

suicide, with respect to which a lack of response would support a finding of deliberate indifference.  See Greason v. Kemp, 891 F.2d 829, 835 (11th Cir. 1990) ("Where prison personnel directly responsible for inmate care have knowledge that an inmate has attempted, or even threatened, suicide, their failure to take steps to protect that inmate from committing suicide can amount to deliberate indifference.").

To be sure, Francis' declaration (Doc. 43-2), is a bare bones document essentially consisting of two sentences:

> "I have personal knowledge that the officers in that section of the jail were aware of threats Darius [James] had made to kill himself but they just didn't care."

> "I am aware that Darius had been telling the officers for 2-3 weeks prior to his death that he was going to hurt himself."

But Francis has not been deposed and his declaration under penalty of perjury stands unrefuted except by the Individual Defendants' own oral testimony.  That results in a classic swearing contest that can only be resolved by the jury.[12]  See Avenue CLO Fund, Ltd. v. Bank of America, N.A., 723 F.3d 1287, 1294 (11th Cir. 2013) (quoting Stewart v. Booker T. Washington Ins., 232 F.3d 844, 848 (11th Cir. 2000)).  It may well be that Francis is subject to impeachment, but so are the Defendants in terms of their obvious

---

[12]Indeed, it is the law of the Circuit that even in an criminal case a defendant may be found guilty "on the uncorroborated testimony of a single witness" if the jury chooses to credit that testimony.  United States v. Hoskins, 628 F.2d 295, 296 (5th Cir. 1980).  Decisions of the Fifth Circuit prior to October 1, 1981 constitute the law of the Eleventh Circuit.  Bonner v. City of Pritchard, 661 F.2d 1206 (11th Cir. 1981).

personal interest in the outcome of this case.  The determination of whom to believe is the vital function of the fact finder at trial.

Lastly, the Parties have presented conflicting expert opinions on the question of whether there was a known risk that James would commit suicide, and whether the Individual Defendants were deliberately indifferent to that risk.  That testimony alone is sufficient to create a genuine issue of fact concerning the element of deliberate indifference.

Thus, taking all of these circumstances in the light most favorable to Ms. Jackson, a jury could reasonably find that the Individual Defendants knew of the risk that James would commit suicide, and deliberately failed to take action to prevent his death. See Snow, 420 F.3d at 1267, 1270.  See also See Tolan v. Cotton, — U.S. —, 134 S. Ct. 1861 (2014) (vacating and remanding entry of summary judgment on the basis of qualified immunity in a 42 U.S.C. § 1983 action where the district court failed to view the evidence at summary judgment in the light most favorable to the nonmoving party).

While a closer case, the Court also finds that material issues of fact remain in dispute as to whether the Individual Defendants responded in a timely manner to James' suicide. There is conflicting testimony as to the number of officers who responded, when they responded, and whether the Individual Defendants ignored calls for help for a period of time.  See Bozeman, 422 F.3d at 1273.  And while the Individual Defendants call the testimony of inmate Summers into question, the Court simply cannot make such credibility determinations at this stage of the case.

The Court will therefore deny summary judgment on the grounds that material issues of fact remain in dispute on the question of whether the Individual Defendants violated James' clearly established rights.  Qualified immunity does not provide a defense at this stage of the litigation.[13]

### Conclusion

Accordingly, upon due consideration, the Court finds that genuine issues of material fact remain in dispute concerning whether the Individual Defendants' conduct violated clearly established law.  Specifically, material disputed facts exist as to the extent of these Defendants' subjective knowledge about James' suicidal intentions prior to his death on October 14, 2007.  Moreover, the law was clearly established at the time of James' suicide such that the Individual Defendants were on notice that deliberate indifference to a known risk of suicide, and/or delayed medical treatment, would be unconstitutional.  The motions for summary judgment (Docs. 35-36) are therefore DENIED.

Because the Court of Appeals issued a limited remand, jurisdiction of this case otherwise remains with the Court of Appeals.  The stay entered on March 30, 2012 therefore remains in full force and effect.  The Clerk is directed to forthwith send a copy of this Order to the Clerk of the Eleventh Circuit Court of Appeals.

---

[13]The Individual Defendants are of course free to raise the qualified immunity defense at trial and again during post-trial and post-verdict proceedings in the event the Plaintiff prevails at trial.  The Court's rulings in this case do not mean that the defense has been lost forever.  See Cottrell v. Caldwell, 85 F.3d 1480, 1487-88 (11th Cir. 1996); Kelly v. Curtis, 21 F.3d 1544, 1546-47 (11th Cir. 1994)

IT IS SO ORDERED.

DONE and ORDERED at Ocala, Florida this 23rd day of June, 2014.

UNITED STATES DISTRICT JUDGE

Copies to:   Counsel of Record
Maurya A. McSheehy
Eleventh Circuit Court of Appeals